In the Matter of the Accounting of Lincoln Rochester Trust Company, as Executor of ROSE L. ALLING, Deceased.

Surrogate's Court, Monroe County, November 30, 1945.

*K. B. Castle* for executor.

*Archibald E. Webster,* special guardian for Joanna T. A. Secrest and others, infants.

FEELY, S. When this testatrix died on January 19, 1945, there were registered in the stock book of The Alling & Cory Company 2,400 shares of its common capital stock in her name simply, and also 6,000 of its like shares in her name " as life tenant under the will " of her deceased husband. The same banking corporation is sole executor under each will. As her executor, it now petitions for a determination as to the proper distribution of certain cash dividends on each block of stock which were paid by the corporation on January 30, 1945, to the corporate executor. These dividends had been declared on January 26, 1945, to be paid on or about January 30, 1945, to stockholders of record on December 30, 1944. It is stipulated all this was done following a custom of long standing in the corporation. This custom, however, is not mentioned in the resolution declaring the dividend, which was carried by a vote of eight to four of the directors. Are those dividends now to be treated as principal, or as income, in the respective estates?

Insofar as the legacy of the 6,000 shares is involved, the testator's will declares this bequest to be one of specific property " now owned by me ", which he directed to be transferred to his widow by his executor in full quittance of the executor's duty; and that she is " to have and to hold the same during her natural life ", with authority in her, with consent of their two sons, to use so much of the principal thereof as she may deem necessary for her comfortable support and maintenance, " in consonance with her customary mode of life ". The will also declares this provision for the widow. to be in lieu of dower and all other rights in testator's estate.

The word " income " is not used, nor is any such equivalent as " rents, issues and profits "; nor does the will make any reference to either earnings, surplus or dividends. The residuary provision is a general bequest of all the rest of his property to his two sons, Harold L. Alling and Eric L. Alling.

Under the last will of this testatrix the bulk of her estate, after minor bequests of specific articles of household equipment, is given directly to petitioner as her testamentary trustee for the use of her grandchildren, with remainder to their distributees, or failing such to one of the two sons, or the latter's wife. Some of the primary beneficiaries are minors. In giving her trustee authority to make final decision on the subject of treating certain specified kinds of dividends as principal, or income, or partly one or the other, testatrix specified " extra-ordinary cash or non-cash dividends ", but she omitted to add to her classification ordinary cash dividends, such as are now under consideration.

The effect of the bequest of the 6,000 shares to the widow was to create in her, without the interposition of an express trust, a legal life estate, with qualified personal rights in the principal that were never exercised by her; hence the contingent rights that the two remaindermen acquired at their father's death in 1937 became absolute in them at the death of the widow, both as to principal and also as to any dividends thereafter to be declared (*Matter of Lander,* 162 Misc. 201). At no time in her lifetime did the widow have any legal right as against the corporation in or to the dividends that were created after her death; nor has her estate any right thereto as against the remaindermen. Insofar as any equities might be urged as arising out of the liberality of her husband's peculiar manner of bequeathing to her the 6,000 shares, it was pointed out in *Matter of Bonbright* (186 Misc. 172) recently that the courts are averse to taking any action that would be tantamount to

their declaring retrospectively dividends that those best qualified and empowered so to do did not see fit to declare. The action of the directors after her death in creating the dividend was not intended to deprive the remaindermen under their father's will of their rights in the premises. At the widow's death her title to her own 2,400 shares passed to her testamentary trustee; and as an incident to the trustee's legal title the dividends created after the death of this testatrix became part of the corpus of the trust, subject to administration expenses and the usual charges. The action of the directors was not designed to interfere therewith.

Under each will the legacies were mere gratuities. The present case does not involve any contractual obligation or any market or exchange custom; nor can there be any doubt in any aspect of this case as to the legal validity of the act of the Alling corporation in paying those dividends to the executor of the widow, as she was the registered holder or owner of the pertinent lots of stock as of the record date, December 30, 1944.

As to the 6,000 shares registered on the Alling corporation's books in the widow's name " as life tenant under the will " of her husband, this corporation was charged with notice of the provisions of Mr. Alling's will; but no party in interest now attaches much importance to this feature. The Alling corporation is not a party to this proceeding, which has been submitted as involving only the relative rights of the legatees, as individuals among themselves alone, to the cash dividends now in question.

What effect on those vested individual rights is to be given to the fact that the postmortuary creation of the dividend was expressly for the benefit of stockholders of record as of a date several weeks before the widow's death? Until the decision in March, 1942, in *Matter of Robb* (178 Misc. 240), the answer to that question would clearly be that the fixation of the record date was solely for the protection of the corporation, and did not alter the rights of the legatees as among themselves, especially in such a situation as is now before this court.

However, in the *Robb* case (*supra*) it was held that the record date was controlling on individual rights, where the death of the beneficiary occurred between the date of declaration and that of the record date. In June of 1942, in *Matter of Bashford* (178 Misc. 951), another Surrogate declared he was in complete accord with the reasoning and conclusion in the *Robb* case (*supra*); but a third Surrogate in February of 1943 in

*Matter of Depew* (179 Misc. 1074) appears to have reached the contrary conclusion, when he adhered to the old rule that the record date was merely for the protection of the corporation. The difference is in their respective interpretation of two of our statutes which alone are presently pertinent. The later one of these statutes is section 62 of the Stock Corporation Law, relating to the time period for registration. The Legislature amended this section 62 on March 18, 1943 (L. 1943, ch. 131), a few weeks after the *Depew* case (*supra*); but while it is not clear whether the lawmakers then had the *Depew* case (*supra*) in mind, they could have known of the *Robb* case (*supra*) which had been decided one year before; yet the amendments of section 62 in 1943 are so clearly immaterial to the difference of opinion above mentioned as to make it probable the Legislature was unaware of the *Robb* ruling (*supra*) also or regarded it as merely interpretative; with the result that the amendment of section 62 in 1943 cannot be said either to have settled the conflict of opinion, or to have amended the 1913 statute (L. 1913, ch. 600), to wit, article 6 of the Personal Property Law (§§ 162–184), which is the only statute containing any expressly exclusionary feature.

In 1913 the addition of these sections to the Personal Property Law gave New York its first statute on this matter. They embody all the provisions of the Uniform Stock Transfer Act, with some minor additions, not now material. These sections, to a large extent, are declaratory of the case law as it stood before the *Robb* ruling (*supra*); and they have since stood unchanged.

In order to make stock certificates more negotiable by indorsement and delivery, and also to protect the equitable rights of the individual parties among themselves, the first of those sections (§ 162) which is verbatim the same as section 1 of the Uniform Stock Transfer Law, modified the common law by providing that legal title both to certificates, as distinct from merely equitable or beneficial ownership (§ 183), and also to the shares, may be transferred by indorsement and delivery, although the charter, or by-laws, or even the certificate itself, may expressly provide that shares shall be transferable only on the books of the corporation. Such was the common law.

Section 164 reads as follows: *" Corporation not forbidden to treat registered holder as owner.* Nothing in this article shall be construed as forbidding a corporation, (a) to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends, and to vote as such owner * * *."*

Appended to this section, as its appears in section 3 of the Uniform Stock Transfer Act, is this: " Commissioners' Note. This provision is necessary for the protection of the corporation." (6 Uniform Laws Ann., Stock Transfer, § 3). Our Legislature in 1913, in adopting this section 3 verbatim as section 164, must have been aware of the purpose it was declared to serve in the original act. This protection, however, does not exist where the corporation has notice of conflicting claims (*Turnbull* v. *Longacre Bank*, 249 N. Y. 159; *National Surety Co.* v. *Indemnity Ins. Co.*, 237 App. Div. 485).

Moreover, under section 165, a title derived from a document separate from the certificate is extinguished by a title later derived from the certificate by a purchaser in good faith and for value, whose title was acquired " at any time prior to the surrender of the certificate to the corporation ". The commissioners likened this to the recording of a deed of conveyance. A bona fide purchaser, and the corporation, were each in need of protection when the common law had been modified as aforesaid.

Section 179 provides that " In any case not provided for by this article, the rules of law and equity, including the law merchant, and in particular the rules relating to the law of principal and agent, executors, administrators and trustees * * * shall govern."

The rest of the section relates to the invalidating causes that are recognized in equity, such as mistake, fraud, loss, etc.

Up to this point in 1930 in the development of New York law, those provisions appear not to lend any support to the theory that the record absolutely controls individual rights.

The only other pertinent New York statute consisted of certain additions in 1930 (L. 1930, ch. 754) which constituted a new section in the Stock Corporation Law, numbered 62. This section added to the then existing case law and statutes a new provision that put a limit of forty days on the corporation's time either to determine holders of record, or to close the stock book against transfers, in aid of the same purpose. No such provisions ever were either in the Uniform Stock Transfer Act, or in our equivalent in sections 162–184 of the Personal Property Law. The common law had required transfers to be registered on the books of the corporation. This was modified in 1913 " for the protection of the corporation ", and also bona fide purchasers, as stated above. The enactment of 1930 simply set up a definite time limit for registration. Before either statute, of 1913 or 1930, the courts had recognized the right

of a stock corporation to treat as the owner of shares the person registered on its books as such, provided the corporation had no notice of any conflicting claim. This is implicit in the 1930 section; and the Legislature had already expressly declared in 1913 that the corporation might recognize the right of the record holder to receive dividends to the exclusion of any other person. The emphasis was placed in 1930 on the time limit when the new section 62·provided that the directors might fix " a record time for the determination of the stockholders entitled to receive any such dividend * * * and in such case only stockholders of record at the time so fixed shall be entitled to receive such dividend * * *." Aside from this time limit, the rest of this part of section 62 was merely declaratory of the uniform provision which appears verbatim in our section 164, which in the Uniform Act the commissioners had proposed for enactment on the representation it was designed " for the protection of the corporation." Section 62 also related to shares of no par value, which by the amendment of 1943 was replaced by the broader wording, as to " interests arising out of any change, conversion or exchange of capital stock ".

In view of the development of this legislation up to date, as outlined above, there appears to be no basis for the argument that unless the clause declaring that " only stockholders of record at the time so fixed shall be entitled to receive such dividend " be read as controlling absolutely the rights of individuals among themselves, as distinct from the corporation's protective privilege, then the enactment of 1930 would not have served any purpose. There also appears to be no good ground for reading either section 164 of the Personal Property Law, or section 62 of the Stock Corporation Law, so separately and literally as to make the record date controlling on any and all aspects of the transfer of stock, be they voluntary or by operation of law, or donative, or contractual. In the *Depew* case (179 Misc. 1074, *supra*) it was pointed out that as late as 1942 the legal profession had not yet become aware that any such important change had been made.

It has been said that section 62 cannot be so read as to legalize a record date prior to the date of declaration; and also that this section must be read to require the forty days of book closure to follow the declaration (*Lunt* v. *Genesee Valley Trust Co.*, 162 Misc. 859). In that case the defendant corporation declared a cash dividend on January 11, 1935, payable within ten days, to stockholders of record on December 31, 1934. On and after December 31st and through·January 12th, the defend-

ant executor's testatrix was the record owner of stock; and on January 12th the defendant corporation paid her the dividend in the sum of $760. She, however, on January 4th had sold the stock to a broker, who on January 9th sold it to plaintiff. The latter after January 12th brought suit in City Court both against the registered owner, for whom the latter's executor was later substituted, and also against the corporation. The suit against the latter was dismissed for lack of proof of notice. As to the estate of testatrix the court held that the fact that she was the owner of record on December 31st did not protect the corporation in paying her the dividend on January 12th, but because she was the record owner on the 11th and the 12th of January, the payment to her was valid under the statute. The court further held she was liable over to the plaintiff as the then actual owner of the stock for which the $760 dividend was received. This result appears to be correct. (*Broderick v. Aaron*, 264 N. Y. 368.) However, as the directors of the foundry had not closed their books for any period, it is difficult to see how it was necessary for decision in that case to make the statement in the opinion that the registration on December 31st was no protection to the corporation. The few cases, wherein the record date was thus placed before the date of the declaration of dividend, appear to have been based partly on a business practice of first closing a year's business, or other fiscal period, before declaring a dividend of profits; and after the financial status of the corporation has first been definitely ascertained and booked as of the end of the earning period, then the record date is fixed to save the corporation the risk and trouble of searching for such private transfers or devolutions as this case exemplifies; and also to facilitate the booking and auditing of the transaction. As the dividend must have been earned before the beginning of the fixed period of record, it would be appropriately attributable later to the record owner of the stock at the end of the earning period. Where the directors wish to take advantage of the broad permission given by the statute, there does not appear to be any illegality, or fatal irregularity, as to either corporation or individuals, in fixing the record date by day and hour at any time up to forty days before the day of payment, even though that period should be made to run back to a date before the date of the declaration of the dividend. There is nothing in either statute forbidding its being done so, provided the payment is to be made within forty days after the record date that is fixed, with or without closure of the books. The optional procedure of clos-

ing the books to supplement the record date was not adopted in this Alling case.

These Alling testators had the right to fix a time that would be decisive of the rights of others to receive such portion of their respective estates that the law permitted them to transfer or appoint by last will; and that time was fixed as the death of Mrs. Alling. If the purpose of the pertinent statutes was to enable strangers after that decisive date to divest rights in devisable property that had vested at the death of Mrs. Alling, then it appears to be the better view of those enactments, in the light of their development and declared purpose, that the language in them claimed to express any such extraordinary purpose falls far short of the necessarily appropriate clarity.

There was no intention on the part of the Legislature in enacting the two statutes aforesaid, nor on the part of the Alling directors, to divest rights that had already vested in the stock and its produce; nor is there in the will of either of these testators any indication of an intention to bequeath such an expectancy, if it can properly be called such, as appears in *Matter of Brenner* (169 Misc. 412, 414, affd. 256 App. Div. 1064), where a corporation had set up a surplus as of January 1st; and on that day a stockholder, whose name appeared in the firm, died. By his last will he had bequeathed to five persons all his " interest in and to the share of undivided profits, and income and unpaid dividends " to which he might be entitled as of the day of his death, with the proviso that if a dividend were declared after his death out of the earnings up to his death, then this dividend should be prorated among the five legatees. All the rest of his estate he bequeathed to charity. Before his death no pertinent dividend had been declared; but on April 15th following, a dividend was declared out of the surplus; and the five legatees were held to be entitled to a prorata portion thereof.

So seldom does it happen to a testator to will such an " expectancy ", that his intention so to do should be clearly expressed on the face of the will; otherwise its unusual postmortuary feature would stand in the way of reading a bare possibility into a simple bequest of stock, or of a specific security.

Although the custom of the Alling corporation for twenty years had been to declare dividends yearly in the manner and form in which the declaration of January 26, 1945, was made, yet the dividends in question were not necessarily required to be so declared. The fact is stipulated that the declaration just mentioned was carried by a vote of eight to four in the

meeting of the directors. Not being " at fixed periods ", within the meaning of section 204 of the Surrogate's Court Act, these dividends could not be apportioned.

My conclusion, therefore, is that the $4,500 of dividend on the lot of 6,000 shares received January 30, 1945, by the executor of the will of Rose L. Alling belongs to the two remaindermen under the will of Joseph T. Alling as principal bequeathed to them; and that said sum is not income in the estate of his widow; and my conclusion also is that the $1,800 of dividend received on the same date by the executor of Rose L. Alling on her own 2,400 shares must be deemed principal in the testamentary trust created by her last will.

On notice submit for signature and entry a decree in accord with this decision.